UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MIMS PROPERTIES INVESTMENTS,
LLC, etc., et al.,

        Plaintiffs,

v.                           CASE NO.  8:11-CV-1093-T-17TBM

MOSAIC FERTILIZER, LLC,
etc.,

        Defendants.

_____/

ORDER

This cause is before the Court on:

Dkt. 49    Motion for Judgment on the Pleadings on Counts I,
            II, III, IV, VI, VII, IX, XI, XII and XV
Dkt. 53    Opposition
Dkt. 56    Reply

Plaintiffs and Defendant are owners of large tracts of adjacent real property in Polk County on which phosphate mining activities have been carried out, and which are subject to reclamation.  In this case, Plaintiffs seek the award of damages for Defendant's alleged breaches of a settlement agreement the parties entered into on April 21, 2008.  The parties entered into the settlement agreement to resolve the disputes involved in Case No. 8:05-CV-2271-T-26EAJ, Mims/Alafia LLC v. Mosaic Fertilizer, LLC.  In that case, after a bench trial, an amended final judgment in the amount of $5,450,000 was entered in favor of Mims/Alafia, LLC and against Mosaic Fertilizer, LLC on June 18, 2007 (Dkt. 104), and a cost judgment of $10,514.05 was entered. (Dkt. 132).  Both parties appealed.  Upon resolution of the dispute by settlement, Satisfactions of the two judgments were entered. (Dkts. 145, 146).

Case No. 8:11-CV-1093-T-17TBM

The parties entered into a Revised Memorandum of Understanding ("MOU") dated October 16, 2007 with respect to the settlement of Case No. 8:05-CV-2271-T-26EAJ, and on April 21, 2008 executed the "Closing Agreement," a "Mutual Release Agreement" (Dkt. 48-1) and other closing documents.

In the Second Amended Complaint (Dkt. 25), Plaintiffs contend that Defendant Mosaic breached the Closing Agreement and other agreements between the parties in various ways, as set forth in the separate counts of the Second Amended Complaint. The Court notes that Counts V, Breach of Transfer Agreement, Count XV, Tortious Interference, and Count XVI, Negligent Misrepresentation, have been dismissed with prejudice. (Dkt. 78).    The Court also notes that, even if the Motion for Judgment on the Pleadings were to be granted, the following Counts will remain for resolution in a jury trial:

| | |
|---|---|
| Count VIII | Breach of Settlement Agreement (Section 9)(Failure to Deliver Maps and Other Documents |
| Count X | Breach of Covenant of Good Faith and Fair Dealing of Settlement Agreement (Section 12) (Failure to Transfer Sand Deed) |
| Count XIV | Trespass (Outside Control Area Easement) |

I. Standard of Review

A. Fed. R. Civ. P. 12(c)

"Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts."  Cunningham v. District Att'ys Office for Escambia County, 592 F.3d 1237, 1255 (11th Cir. 2010)(quotations and citations omitted).  The Court accepts the facts presented in the complaint as true and views

2

Case No. 8:11-CV-1093-T-17TBM

them in the light most favorable to the nonmovant.  Id.  Dismissal is not appropriate
unless the complaint lacks sufficient factual matter to state a facially plausible claim for
relief that allows the Court to draw a reasonable inference that the defendant is liable
for the alleged misconduct.  See Bell Atlantic v. Twombly, 550 U.S. 544, 556 (2007).

B.  Consideration of Documents Attached to the Complaint or Incorporated

The Court limits its consideration to well-pleaded factual allegations, documents
central to or referenced in the complaint, and matters judicially noticed. La Grasta v.
First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).  The Court may consider
documents which are central to plaintiff's claim whose authenticity is not challenged,
whether the document is physically attached to the complaint or not, without converting
the motion into one for summary judgment.   Speaker v. U.S. Dept of Health and
Human Services Centers for Disease Control and Prevention, 623 F.3d 1371, 1379
(11th Cir. 2010); SFM Holdings, Ltd. v. Banc of America Securities, LLC, 600 F.3d
1334, 1337 (11th Cir. 2010); Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir. 2005);
Maxcess, Inc. v. Lucent Techs., Inc., 433 F.3d 1337, 1340 n. 3 (11th Cir. 2005).

II.  Discussion

Defendant Mosaic seeks judgment on the pleadings follows: 1) as to Counts I,
III, XI, XII and XV because Plaintiffs released those claims; 2) as to Count I, because
Plaintiffs cannot bring suit against Mosaic under the "Reclamation Agreement" or
"MOS-N-CPH"; 3) as to Count II and partially as to Count XV, because the 2008
Settlement Agreement did not require Mosaic to "notify and file for a permit transfer"; 4)
as to Count IV, because nothing in the Settlement Agreement precluded Mosaic from
seeking extensions of reclamation deadlines with FDEP; 5) partially as to Count I, VI
and VII because the allegations therein are inconsistent with Plaintiffs' written
representations to FDEP, resulting in a waiver of the claims; 6) as to Counts I, IV, VII,

3

Case No. 8:11-CV-1093-T-17TBM

IX and XI because the Counts concern issues within the primary jurisdiction of FDEP.

A.  General Principles

Under Florida law, the validity and effect of a settlement and release are governed by contract law.  <u>Mergens v. Dreyfoos</u>, 166 F.3d 1114, 1117 (11th Cir. 1999). A party is bound by, and a court is powerless to rewrite, the clear and unambiguous terms of a voluntary contract.  <u>Id</u>.

The interpretation of the agreement is a question of law for the court, and "words...are to be given their plain and ordinary meaning."  <u>Schwartz v. Florida Bd. of Regents</u>, 807 F.2d 901, 905 (11th Cir. 1987).  In interpreting the subject contract, [t]he court's role is to determine the intention of the parties from the language of the agreement, the apparent objects to be accomplished, other provisions in the agreement that cast light on the question, and the circumstances prevailing at the time of the agreement.  <u>Id</u>. (citations omitted).

Parol evidence may be considered only when the contract language contains a latent ambiguity.  <u>Wheeler v. Wheeler, Erwin & Fountain, P.A.</u>, 964 So.2d 745, 749 (Fla. 1st DCA 2007).  A latent ambiguity exists where the language is clear and intelligible and suggests a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two possible meanings.  <u>Barnwell v. Miami-Dade Sch. Board</u>, 48 So.3d 144, 145-46 (Fla. 1st DCA 2010).  If an agreement is ambiguous, the Court should follow a construction that best comports with logic, reasons, and the purposes underlying the parties' agreement.  <u>See Wright & Seaton, Inc. v. Prescott</u>, 420 So.2d 623, 629 (Fla. 4th DCA 1982).  Courts are required to construe a contract as a whole, and give effect, where possible, to every provision of the agreement.  <u>See</u> <u>Story v. Culverhouse</u>, 727 So.2d 1128, 1130 (Fla. 2d DCA 1999).   Where a business transaction is based on more than one document

4

Case No. 8:11-CV-1093-T-17TBM

executed by the parties at the same time, in the course of the same transaction, and which concern the same subject matter, the documents will be construed together.  J.M. Montgomery Roofing Co. v. Fred Howland, Inc., 98 So.2d 484, 486 (Fla. 1957).

Under Florida law, time for performance should be considered of the essence if any of the following apply: 1) express recital in the parties' contract; 2) where, from the nature of the subject matter or fluctuations in the value or from the terms of the agreement, the treating of time as a non-essential will produce a hardship, and delay by one party in completing or in complying with a term would necessarily subject the other party to serious injury or loss; and 3) an express notice, given by a party who is not in default to the other party who is in default, requiring the contract to be performed within a stated time, which must be a reasonable time, according to the circumstances of the case.  Blaustein v. Weiss, 409 So.2d 103 (Fla. 4th DCA 1982).

B.  The Closing Agreement

The Closing Agreement states that the parties are closing certain transactions described in the MOU, and wish to set forth the parties' agreements as to post-closing obligations relating to the MOU and the transactions described therein.   The substantive terms of the Closing Agreement, in summary form (**not verbatim)**, include:

> 2.  Conveyance of Parcels AA, EE, GG, HH by special warranty deed delivered to Plaintiffs on closing date;
>
> 3.  Mosaic's warranty of no violation of any zoning, pollution, environmental, fire, sewage, building or other federal, state or local law, code, ordinance or regulation as the above Parcels, not cured by closing date, and agreement to indemnify Plaintiffs for any claim asserted prior to first anniversary of the closing date ("Remediation Period"); limiting Mosaic's obligation to indemnify Plaintiffs for "Environmental Claims" as specified, specifying procedure to determine scope of Mosaic's obligation

Case No. 8:11-CV-1093-T-17TBM

and providing reasonable opportunity to Mosaic to cure the Environmental Claim" at Mosaic's expense; providing that Mosaic's contractors and consultants shall be approved in advance by Plaintiffs, shall work under supervision of Plaintiffs' environmental consultant; requiring Mosaic to promptly commence or cause to be commenced and prosecute to completion all curative work; providing that Plaintiffs may cause curative work to be performed and all costs of such curative work shall become part of the Environmental Claim as if it had been filed and asserted during the Remediation Period.  Mosaic disclaims all warranties, express or implied, except for the limited warranty of title contained in the special warranty deeds delivered to Plaintiffs on the closing date.

4.  No proration of real estate taxes for 2008; providing that Plaintiffs shall pay the taxes and provide copies for the Parcels to Mosaic; within fifteen days of receipt Mosaic shall reimburse Plaintiffs for the pro rata portion of the tax bills applicable to the portion of the calendar years prior to the closing date, on a per diem basis using the maximum available discount.

5.  As to Parcel AA, Mosaic shall convey to Polk County by quit claim deed the strip of land adjacent to and between the western boundary of said Parcel and the existing right of way for CR 555; providing that Mosaic shall acquire and convey oil and gas interests described in item 5 of Schedule B-II of the Title Commitment ("Stuart Interest") to Plaintiffs; the additional ROW to be conveyed to the County as soon as reasonably practicable after closing date; providing that Mosaic shall convey the Stuart Interest to Plaintiffs as soon as reasonably practicable after closing date.  After the conveyances, Mosaic shall, at Mosaic's expense, cause Chicago Title Insurance Company to issue a Title Policy for Parcel AA without an exception for lack of access to Parcel AA and without an exception for the Stuart Interest, or endorse the Title Policy to delete the two exceptions.

6.  Within a reasonable time after the closing date, Mosaic shall, at its sole expense, cause J. Ronald Kendrick ("Surveyor" to identify whether the title exceptions in the Title Policy for each Parcel actually affect such Parcel; cause the exceptions to be identified on the Survey; providing Mosaic has no obligation or liability for the exceptions which affect the Parcels; providing that if Surveyor determines title exception does not apply or affect such Parcel, Mosaic shall at its sole expense cause the Title company to issue a Title Policy without the exception or endorse the title Policy to delete the exception.

Case No. 8:11-CV-1093-T-17TBM

    7.  The Parties agree that the Termination and Release of Control Area Easement ("Termination") , which is incorporated, shall not be effective until Mosaic has completed all earth-moving operations in connection with its reclamation activities; providing that the Termination shall be held in escrow by the title Company.  Upon completion of all earth-moving operations under the Control Area Easement, Mosaic shall notify the Title Company in writing to release the Termination to Plaintiffs for recordation; providing that the Title Company as Escrow Agent shall hold and deliver the Termination in accordance wit the terms and provisions of the Closing Agreement; providing that Plaintiffs and Defendant shall pay one-half of the Escrow Agent's fees and costs in the event of litigation; providing that the Escrow Agent acts only in the capacity of a depository; providing that Plaintiffs and Defendant shall indemnify the Escrow Agent except for gross negligent or willful malfeasance of the Escrow Agent; providing that the Escrow Agent shall continue to refrain from acting until a final arbitration or adjudication of the rights of adverse claimants or all differences have been adjusted by agreement between and among the parties; providing for termination of the Escrow Agent's duties upon delivery of all documents to the appropriate party under the terms of the Closing Agreement or delivery to a court of competent jurisdiction after a dispute has arisen.

    8.  Plaintiffs and Defendant shall continue to cooperate after the closing date to resolve hydrology issues relating to the Control Area Easement; the parties are seeking approval from FDEP of an agreed Conceptual Reclamation Plan and related hydrology within the mining area within the Control Area Easement; the parties have agreed that certain crossings of wetland features should be included in the FDEP Plan and the locations of such crossings have been included in the submissions to FDEP; providing that upon its approval by FDEP, the FDEP shall be deemed incorporated and shall become a part of this Closing Agreement by reference.  Mosaic shall complete all reclamation required under the FDEP Plan, including, without limitation, any crossings required.  Upon completion of all reclamation under the FDEP Plan and the release by FDEP of Mosaic from further reclamation obligations thereunder, Plaintiffs shall assume full responsibility for all aspects of the agreed-upon hydrology on the site (including the crossings) and shall be deemed to have automatically released Mosaic and all affiliates from any and all claims arising out of or in any way related to the agreed-upon hydrology on the site (including the crossings), any flooding or other occurrences on the subject site resulting from the agreed upon hydrology, and installation and construction of the crossings; indemnifying Mosaic from all Losses

Case No. 8:11-CV-1093-T-17TBM

relating to the hydrology issues on the site (including the crossings);
providing that Plaintiffs' assumption of responsibility, release and
indemnification shall be self-operating upon the FDEP's release of
Mosaic.

9.  Mosaic shall provide Plaintiffs with electronic maps, topographical
maps, aerials, CRP, hydrology studies on permits, excluding GIS
coverages, relating to the Parcels: if in Mosaic's possession on closing
date, requiring the items to be provided within thirty days; as to items
obtained by Mosaic during reclamation, providing the items within thirty
days of completion, and, as to hydrology studies,  within thirty days after
the hydrology plan has been approved by FDEP.

10.  Mosaic shall perform all reclamation required by FDEP in the area
designated as within Mosaic's responsibility on the MOU Section 8 Plan;
the reclamation shall comply with all FDEP requirements in Mosaic-AGF-
CPG Plan; Mims shall be responsible for reclamation of all remaining
areas on the MOU Section 8 Plan; Mosaic shall also be responsible for
reclamation of drainage ditch installed across SP(4)-B area pursuant to
April 25, 2006 Agreement to Transfer/Exchange Property.

11.  As to the September 29, 1999 Agreement for Covenant Running With
Land, O.R. Book 4324, Page 1504, that appears as exception to title for
Parcel HH, Mosaic agrees to perform all monitoring, maintenance and
mitigation obligations until FDEP has released Parcel HH from the
Covenant.  Plaintiffs shall cooperate with Mosaic in the event Mosaic
requests a modification of the Covenant from the FDEP provided the
modification will have no adverse effect on any non-wetland areas on
Parcel HH.   Mosaic agrees to indemnify Plaintiffs for any Losses arising
from or caused in whole or in part, directly or indirectly, by Mosaic's failure
to perform its obligations under the Covenant as to Parcel HH.

12.  Upon completion of all reclamation by Mosaic on property in the Quit
Claim Deed ("Sand Agreement Property") attached to the Closing
Agreement, Mosaic shall execute and deliver to Florida Sand and Fill, LLC
a further quit claim deed conveying all of Mosaic's rights, title and interest
reserved in the Sand Agreement Deed with respect to the Sand
Agreement Property.

In addition to the substantive terms of the Closing Agreement specifying the parties'
respective obligations, the Closing Agreement provides:

Case No. 8:11-CV-1093-T-17TBM

13.   In the event of any litigation between the parties hereto concerning the terms hereof, the non-prevailing party shall pay the reasonable attorney's fees and costs incurred by the prevailing party in connection with such litigation, including appeals and bankruptcy proceedings.

14.   This Closing Agreement has been negotiated between the parties who are experienced in commercial real estate transactions.  Accordingly, this Closing Agreement shall not be construed against either party as the drafter of the closing Agreement in the event of any litigation with respect to it.  This Closing Agreement shall in all respects be interpreted, enforced and governed by and under the laws and judicial decisions of the State of Florida.

15.   This Closing Agreement may be amended only by a written instrument executed by all of the parties.

16.   This Closing Agreement constitutes the entire and complete agreement between the parties hereto and supersedes any prior oral or written agreements between the parties with respect to the matters set forth herein, including, without limitation, the MOU.  The parties further acknowledge that all of the terms, provisions, obligations and requirements contained in the MOU have been satisfied, except for the specific obligations of the parties set forth in this Closing Agreement and the other documents being executed by the parties at the closing (including any documents being held in escrow).

17.   This Closing Agreement shall survive the closing under the MOU.

C.  Documents Referred to or Incorporated Into Closing Agreement

1.  MOS-N-CPH and 2002 Reclamation Agreement

The Closing Agreement incorporates MOS-N-CPH, a conceptual reclamation plan, upon its approval by the Florida Department of Environmental Protection ("FDEP").  (Sec. 8).   MOS-N-CPH was approved by FDEP on July 25, 2008.   (Dkt. 25-

Case No. 8:11-CV-1093-T-17TBM

2).

MOS-N-CPH incorporates the 2002 Reclamation Agreement.   MOS-N-CPH
states the Reclamation Agreement shall be recognized as "Attachment I" and shall be
considered part of Mosaic's obligation to perform reclamation pursuant to Chapter 16C-
16 F.A.C.   The Reclamation Agreement was intended to document the respective
obligations of the Seller Group, IMC, and Mims with respect to certain reclamation,
mitigation and/or enhancement obligations.  (Dkt. 25-1, Paragraph G).  The obligations
of IMC are stated in Article I.  (Dkt. 25-1, pp. 3-4).  Article I provides:

> "Collectively, the requirements of this Article I shall be the
> "IMC Obligations."  Unless extended as shown in Exhibit B,
> IMC shall complete the IMC Obligations in accordance with
> the schedules set forth in the Fourth Amendment [to
> Consent Order, OGC Case No. 87-0174, entered into
> between IMC and the DEP on December 3, 2002], Life of
> Mine Permit, or permits listed in Exhibit A that are
> transferred to IMC."

(Dkt. 25-1, p. 3).

2.  2006 Agreement to Transfer/Exchange Property

The 2006 Agreement to Transfer/Exchange Property is referred to but is not
expressly incorporated in the Closing Agreement.  The terms included below are
included to provide background and context.

In April, 2006, Mims Hammocks, LLC, Nichols Ranch, LLC, Mims Properties,
LLC (collectively "Nichols Parcel Owners") and Mosaic Fertilizer, LLC (formerly Mosaic
Phosphates Company and formerly IMC Phosphates Company) entered into an
Agreement to Transfer/Exchange Properties in a Sec. 1031 like-kind exchange:

Case No. 8:11-CV-1093-T-17TBM

As to the Land, the Nichols Parcel Owners sold  the "Nichols Parcel" to Mosaic. Mosaic sold the "Bradley Parcels" to the Nichols Parcel Owners.  Mims Hammocks, LLC sold the "Horton Road Parcel" to Mosaic.  Mosaic sold the "Mosaic Parcels" to Mims Hammocks, LLC.

As to Personal Property, the 2006 Agreement provides that, to the extent that Seller's interest is assignable,  Seller agrees to convey to Buyer on the Closing Date, all of Seller's right, title and interest, if any, in and to all personal property....pertaining to or on the Land, including the following:

.....

(iii) Licenses and Permits: Except as provided in the following sentence, Seller's rights in and to certificates of occupancy, licenses, permits, intangibles, and other governmental approvals pertaining to the Land and the use thereof including, but not limited to, surface water management systems operating permits issued by the Southwest Florida Water Management District ("SWFWMD") and those mine reclamation related programs, permits and approvals issued by the Florida Department of Environmental Regulation–Bureau of Mine Reclamation ("BMR"), Hillsborough County, or the Environmental Protection Commission of Hillsborough County ("EPC") which have been released.  Mosaic shall retain all active permits for FDEP, BMR, Army Corp[s] of Engineers ("Corp[s]), Hillsborough County, EPC and SWFWMD which have existing and continuous reclamation and mitigation obligations.  This Section only applies to licenses and permits that directly affect the land and shall not include transfer of any permits and licenses that may also benefit other land of the Seller.  The parties shall agree on a list of permits to be transferred prior to closing;

....

(v)  Appurtenances and Additional Interests: Any and all rights, entitlements and appurtenances to the Land, including, but not limited to, rights of ingress and egress, any and all air space rights and subsurface rights; mineral rights, riparian and littoral rights, together with all appurtenant rights and interest pertaining to adjacent streets and

11

Case No. 8:11-CV-1093-T-17TBM

roadways; and

(vi)   Maps/Reports:   All topographical maps, aerials, hydrology reports, reclamations plans, boring data (if any) and any other reclamation related reports, studies or information regarding the Land (the "Reports").  Each party recognizes that such information is being provided without representation or warranty as to the completeness or accuracy.

As to Easements, the Agreement transferred: "Any and all of Seller's rights in and to all easements, if any, benefitting the land, with all of such easements subject to Buyer's approval."

Paragraph 8 (a) of the Transfer Agreement provides that Mosaic agreed to grant to Nichols Parcel Owners, applicable governmental entities and any entities related to William Thomas Mims and to the Nichols Parcel Owners that own property adjacent to the Nichols Parcels, an easement over the Nichols Parcel for installation and maintenance of utilities, which shall run with the land.  In Paragraphs 8(b), Mosaic further granted to Nichols Parcel Owners or its designee entity a temporary access easement to complete mandatory reclamation under AGF-N-N(3) reclamation program. The access easement was to remain in effect until issuance of a release by the Bureau of Mine Reclamation.  Mosaic further agreed to allow the Nichols Parcel Owners or their designees the right to discharge surface water from the AGF-N-N(3) reclamation program during the active reclamation and establishment of vegetation into the recirculation ditch located on the Nichols Parcel immediately to the west of the AGF-N-N(3) reclamation program area.  The drainage from the AGF-N-N(3) program was to drain according to the approved FDEP Conceptual Reclamation Plan.

The Closing Documents to the Agreement to Transfer/Exchange Properties were to include an assignment of Seller's rights in the permits, agreements, licenses and approvals associated with the Land including the Reports as described in subsections 1(b)(iii) and (vi).

12

Case No. 8:11-CV-1093-T-17TBM

Pursuant to Paragraph 15 the Agreement to Transfer/Exchange Properties, Mosaic agreed to complete Reclamation Activities as stated in Paragraphs 15 a, b, c, d and e.

Paragraph 21 of the Agreement to Transfer/Exchange Properties provides:

**21.   FURTHER ASSURANCES**.

> Each party, at any time and from time to time after the closing, upon the request of the other party, shall do, execute, acknowledge and/or deliver, and cause to be done, executed, acknowledged and/or delivered, all such further acts, deeds, assignments, transfers, conveyances, releases or assurances as reasonably as may be required to consummate the transactions contemplated herein, including, without limitation, vesting good and marketable title in the Property to Buyer.  The Terms and provisions of this paragraph shall survive Closing and delivery of the Deeds.

Paragraph 23 of the Agreement to Transfer/Exchange Properties provides:

**23.   PERMITS**.

> Each Seller, regarding the portion of the Land conveyed by such Seller to the applicable Buyer, shall, at the request of such Buyer and at no cost to such Seller: (a) execute documents required of a prior landowner to transfer permits and approvals to such Buyer; and (b) not object to permits, approvals, and modifications thereto, including amendments to land use and/or zoning, applied for by such Buyer.  The terms and provisions of this Section shall survive Closing and delivery of the Deeds.

3.  2008 Termination and Release of Control Area Easement

The Closing Agreement incorporates the "Termination and Release of Control

13

Case No. 8:11-CV-1093-T-17TBM

Area Easement Agreement." ("Termination")  Agrifos Mining, L.L.C. granted certain
easements to IMC Phosphates Company in an Agreement dated December 3, 2002
("IMC Control Area Easement Agreement", "IMC CAEA").  The purpose of the
easements was to permit IMC to complete mining of the Reserve Areas and to perform
land reclamation activities required by applicable county and state laws and regulations
with respect to Reclamation Areas and portions of the Reserve Areas mined by IMC,
and incidental activities: "the right to build, maintain and repair, relocate, remove, use
and operate new and existing roads, ditches, discharge points, electric transformers
and transmission lines, catch basis, communications lines and pipe lines, and the
movement of drag lines, equipment, personnel and materials across the Control Area."
The Agreement further granted the right to consumptive use of subsurface water, the
right to drain and flow, divert, redirect or block the flow of water across the Control Area,
the right to remove and use sand tailings and surface water on or from the Control Area
for on-site and off-site land reclamation, mining and beneficiation projects, the right to
enter upon the Control Area and take action IMC believed necessary or desirable to
contain spills originating from the Control Area as a result of IMC's mining or
reclamation activities or upon IMC's lands beyond the boundaries of the Control Area;
the right to deposit, store and use in connection with mining related activities spoils,
tailings and debris resulting from IMC's mining activities, all until completion of IMC's
reclamation activities with respect to the Reclamation Areas and portions of the
Reserve Areas mined by IMC, and the formal release of the affected lands by
applicable county and state agencies.  The Agreement further granted IMC an
easement and right of access over and upon the Facility Easement for ingress and
egress to the Control Area.  The IMC CAEA identifies the location of the easements,
and provides that the easements and rights set forth in the Agreement shall run with
title to the Control Area and shall be binding upon any and all persons having any
ownership interest in the Control Area.  The IMC CAEA further provides that it is binding
upon and insures to the benefit of the parties to the Agreement and their respective
successors and assigns.  Defendant Mosaic is the successor to IMC Phosphates
Company.

14

Case No. 8:11-CV-1093-T-17TBM

The parties agreed that the incorporated Termination would not be effective until Mosaic has completed all earth-moving operations in connection with its reclamation activities thereunder, and that the Termination would be held in escrow by the Title Company until such time as the earth-moving operations have been completed. Plaintiffs, owners of the Control Area, granted to Defendant Mosaic a temporary access easement over, across and through the Control Area so that Mosaic could carry out required reclamation activities, discharge surface water, and plant required vegetation:

4. <u>Access to Wetlands and Control Area</u>.  Notwithstanding the Release and Termination provided herein, Mosaic desires to access the Control Area to complete reclamation activities.  Accordingly, Mosaic has requested from Mims a temporary access easement.  Mims has agreed to grant the temporary access easement as provided in this Section:

(a)    Mims hereby grants, bargains, sells and conveys to Mosaic, it successors and assigns, a non-exclusive easement over, across and through the Control Area for the purposes of providing Mosaic with ingress and egress for pedestrian and vehicular traffic over the Control Area so that Mosaic may (i) undertake, complete and perform all land reclamation activities required by applicable county, state and federal laws, ordinances, regulations, codes, orders and other governmental and quasi-governmental requirements (collectively "Laws") with respect to the Control Area (ii) discharge surface water during active reclamation, and (iii) plant, grow and establish such vegetation as may be required under applicable Laws.  Mosaic shall have the sole discretion regarding the manner, method and conduct of its reclamation activities within the Control Area, subject to compliance with applicable Laws.

(b)    The temporary easement granted hereby shall terminate as to each reclamation program upon Mosaic's completion of all reclamation activities with respect to such reclamation program area and the formal release of the affected lands by all applicable county, state and federal agencies having jurisdiction over such reclamation activities, including, without limitation, the Bureau of Mine Reclamation ("Termination Date").  Notwithstanding that the temporary easement shall terminate automatically as provided herein, Mosaic, at the request of Mims on or after each Termination Date shall execute a termination and release of easement in recordable form at no cost to Mims.

Case No. 8:11-CV-1093-T-17TBM

D.   Mutual Release Agreement

The Mutual Release Agreement provides, <u>inter</u> <u>alia</u>:

**<u>BACKGROUND</u>**

.......

B.    The parties have agreed to settle the Lawsuit as well as other outstanding issues affecting them and their business interest, including real estate holdings, pursuant to a Revised Memorandum of Understanding dated October 16, 2007 (the "MOU").  A true and correct copy of the MOU is attached to the Agreement as Exhibit "A". [The MOU is not attached to Dkt. 48-1].

C.    On or about the date hereof, the parties are executing and delivering to each other various deeds, bills of sale, easements, agreements, terminations, affidavits and other documents, including, without limitation, a Closing Agreement (collectively, including any documents in escrow, the "Closing Documents") pursuant to and in satisfaction of their respective obligations under the MOU.

D.  As a integral component of the settlement, which is set forth in the MOU, the parties have agreed to execute a general mutual release to resolve and settle with finality all disputes and claims that exist or may exist involving the parties, whether or not they were raised in the Lawsuit, excepting only (i) the parties' obligations under the Closing Documents, and (ii) the parties' obligations under all other existing written agreements between or among the parties hereto (or any of them or their related entities, including as a successor) with respect to property in Polk County, Florida, provided, however, that any Claim (as defined in Section 4 below) made pursuant to this subparagraph D. (ii) must relate to matters arising or occurring subsequent to the date of this Agreement (collectively, the "Excluded Obligations").

**<u>TERMS</u>**

......

4.   <u>GENERAL RELEASE</u>.   The parties, on their own behalf and on behalf of their representatives, attorneys, agents, employees, officers, directors, shareholders, members, affiliates, related organizations and successors, completely release, covenant not to sue, and forever

Case No. 8:11-CV-1093-T-17TBM

discharge each other, as well as the other party's current and former representatives, attorneys, agents, employees, officers, directors, shareholders, members, affiliates, related organizations, and successors, from any and all past, present, or future claims, demands, complaints, actions, causes of action, suits, judgments, executions, debts, liabilities, reimbursements, obligations, costs, expenses, covenants, controversies, agreements, promises, trespasses, damages, and/or compensation, of any nature whatsoever, at law or in equity, whether based on contract, statute, tort or strict liability, and whether for compensatory, special, punitive, statutory, or any other damages or remedies of any kind, arising out of or related to any act, omission, matter, or thing, whatsoever, whether known or unknown–even if unascertainable, asserted or unasserted, disputed or undisputed, liquidated or unliquidated, fixed or contingent, including, but not limited to, any claim, defense, issue or matter that was or which could have been raised in the Lawsuit (collectively "Claims" or singularly a "Claim"), and any Claims of Mims against Mosaic relating to any mining operations performed by Mosaic or its predecessors outside of the areas permitted under the Mining and Sand Agreement effective as of October 17, 2003, by and between FS&F and IMC Phosphates Company.  However, nothing in this Agreement shall relieve either party of any of its obligations under the Excluded Obligations.

5.    ASSUMPTION OF RISK, WAIVER, ESTOPPEL, AND COVENANT NOT TO SUE.    The parties acknowledge and agree that paragraph 4, above, is a general release and further agree that each party–having had the opportunity to, among other things, investigate the material issues and facts relating to the Lawsuit, conduct discovery in the Lawsuit, and having had significant consultation with and advice of counsel–hereby knowingly, willingly, and expressly:   a) assume the risk associated with, b) waive all rights relating to, c) agree not to sue one another for any claims that exist or may exist, and d) based on the other party's reliance on the provisions of this Agreement, are estopped from asserting any Claims, even if a party does not now know or suspect that any such Claim exists, whether through ignorance, oversight, error, negligence or otherwise, and even if knowledge of any such Claim would have materially affected the party's decision to settle the Lawsuit or to enter into this Agreement.  Additionally, the parties acknowledge, agree, represent, warrant, and covenant that: a) each party has been provided with, has obtained, reviewed, and/or analyzed all of the information, and has otherwise conducted whatever due diligence, that it deems necessary with respect to entering into this Agreement; b) no party has been pressured, coerced, compelled, or otherwise forced into entering into this Agreement; c) no party has relied